IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

SHERRY EZELL BAZAR,          )   CIVIL ACTION NO. 9:14-537-TMC-BM
                      )
        Plaintiff,      )
                      )
v.                   )   **REPORT AND RECOMMENDATION**
                      )
CAROLYN W. CALVIN,        )
COMMISSIONER OF SOCIAL    )
SECURITY ADMINISTRATION,    )
                      )
        Defendant.      )
_____)

        The Plaintiff filed the complaint in this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of the final decision of the Commissioner wherein she was denied disability benefits.

This case was referred to the undersigned for a report and recommendation pursuant to Local Civil

Rule 73.02(B)(2)(a), (D.S.C.).

        Plaintiff applied for Disability Insurance Benefits (DIB) and Supplemental Security

Income (SSI)[1] on August 27, 2012 (protective filing date), alleging disability as of November 25,

2011 due to migraine headaches, depression, memory loss, high blood pressure, and an overactive

thyroid. (R.pp. 14, 159, 200). Plaintiff's claims were denied initially and upon reconsideration.

Plaintiff then requested a hearing before an Administrative Law Judge (ALJ), which was held on

September 20, 2013. (R.pp. 30-51). The ALJ thereafter denied Plaintiff's claims in a decision

---

[1]Although the definition of disability is the same under both DIB and SSI; Emberlin v.
Astrue, No. 06-4136, 2008 WL 565185, at * 1 n. 3 (D.S.D. Feb. 29, 2008); "[a]n applicant who
cannot establish that [he] was disabled during the insured period for DIB may still receive SSI
benefits if [he] can establish that [he] is disabled and has limited means." Sienkiewicz v. Barnhart,
No. 04-1542, 2005 WL 83841, at ** 3 (7th Cir. Jan. 6, 2005). See also Splude v. Apfel, 165 F.3d
85, 87 (1st Cir. 1999)[Discussing the difference between DIB and SSI benefits].



issued October 11, 2013. (R.pp. 14-25). The Appeals Council denied Plaintiff's request for a review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the Commissioner. (R.pp. 1-3).

Plaintiff then filed this action in this United States District Court, asserting that there is not substantial evidence to support the ALJ's decision, and that the decision should be reversed and remanded for further consideration, or for an outright award of benefits. The Commissioner contends that the decision to deny benefits is supported by substantial evidence, and that Plaintiff was properly found not to be disabled.

### Scope of review

Under 42 U.S.C. § 405(g), the Court's scope of review is limited to (1) whether the Commissioner's decision is supported by substantial evidence, and (2) whether the ultimate conclusions reached by the Commissioner are legally correct under controlling law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Richardson v. Califano, 574 F.2d 802, 803 (4th Cir. 1978); Myers v. Califano, 611 F.2d 980, 982-983 (4th Cir. 1980). If the record contains substantial evidence to support the Commissioner's decision, it is the court's duty to affirm the decision. Substantial evidence has been defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. **If there is evidence to justify refusal to direct a verdict were the case before a jury, then there is "substantial evidence."** [emphasis added].

Hays, 907 F.2d at 1456 (citing Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966)); see also, Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008)[Noting that the substantial evidence standard is even "less demanding than the preponderance of the evidence standard"].

2



The Court lacks the authority to substitute its own judgment for that of the Commissioner. Laws, 368 F.2d at 642. "[T]he language of [405(g)] precludes a *de novo* judicial proceeding and requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

### Discussion

A review of the record shows that Plaintiff, who was fifty-four years old on her alleged disability onset date, and fifty-five years old at the time of the ALJ's decision, has the equivalent of a high school education and past relevant work as a cashier. (R.pp. 23, 33, 48, 159). In order to be considered "disabled" within the meaning of the Social Security Act, Plaintiff must show that she has an impairment or combination of impairments which prevent her from engaging in all substantial gainful activity for which she is qualified by her age, education, experience and functional capacity, and which has lasted or could reasonably be expected to last for at least twelve (12) consecutive months. After a review of the evidence and testimony in this case, the ALJ determined that, although Plaintiff does suffer from the "severe" impairments[2] of migraine headaches, depression, and anxiety, she nevertheless retained the residual functional capacity (RFC) to perform medium work[3] restricted to no climbing, crawling, balancing, or exposure to hazards. Additionally, the ALJ limited Plaintiff to work in a low stress setting with no more than occasional

---

[2]An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. See 20 C.F.R. § 404.1521(a); Bowen v. Yuckert, 482 U.S. 137, 140-142 (1987).

[3]"Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c).



decision making or changes in the work setting and no interaction with the general public. (R.p. 19). Although the ALJ found that Plaintiff could not perform her past relevant work with these limitations, he obtained testimony from a vocational expert and found at step five that Plaintiff could perform other jobs existing in significant numbers in the national economy and thus was not disabled during the period at issue. (R.pp. 23-24).

Plaintiff asserts that the ALJ erred in reaching this decision because his RFC analysis is not supported by substantial evidence and is legally flawed. In particular, Plaintiff asserts that the ALJ erred because he did not perform a function-by-function analysis, drew improper inferences from the record in light of Plaintiff's inability to afford proper treatment for her conditions, and purported to rely on opinion evidence when there was none. However, after a careful review and consideration of the evidence and arguments presented, the undersigned finds and concludes for the reasons set forth hereinbelow that there is substantial evidence to support the decision of the Commissioner, and that the decision should therefore be affirmed. Laws, 368 F.2d 640 [Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion"].

### Medical Records

Plaintiff's medical record reflects that, prior to her condition allegedly becoming disabling on November 25, 2011, she was treated for various impairments (including asthma, hypertension, anemia, hyperthyroidism, depression, and anxiety) at University Family Medicine Trident (University Family Medicine), part of the Medical University of South Carolina (MUSC). (R.pp. 262-275). In July 2011, Plaintiff reported that her migraine headaches were increasing in frequency, are that reportedly due to the cost, she was not currently seeing the endocrinologist who



had treated her thyroid problems in the past. (R.pp. 270-273). Her anemia was attributed to menorrhagia and endometriosis. (R.p. 268). In September 2011, Plaintiff was seen at University Family Medicine for complaints of increased depression and anxiety. It was noted that her mother had been diagnosed with brain cancer, that Plaintiff was upset, and cried several times a week. Although Paxil reportedly helped, it was noted that there was room for improvement, and Plaintiff's Paxil dosage was increased. A referral to a gynecologist for a possible hysterectomy was also resubmitted. (R.pp. 265-267). On November 2, 2011, Plaintiff reported she had had a migraine that lasted for seven days beginning the day after her mother's funeral. Plaintiff also stated that she cried all day, wanted to stay in bed most of the time, and believed there was a service (regarding psychological treatment) through her job and that she would look into it. She received a shot of Toradol for her migraine headache, and it was suggested that she seek counseling. (R.pp. 262-264). Plaintiff does not contend that her medical problems were disabling at this time.

        On November 3, 2011, Plaintiff was examined by Dr. Christopher Goodier, a gynecologist at MUSC. Plaintiff reported menorrhagia and anemia (she said she could not tolerate iron supplements) , and Dr. Goodier noted that Plaintiff was being followed for a variety of other issues by her primary care provider. Dr. Goodier reviewed Plaintiff's ultrasound from 2010, and ordered an endometrial biopsy. (R.pp. 258-261). On November 10, 2011, Dr. Goodier told Plaintiff that the biopsy revealed focal endometrial uterine cancer (Grade 1), and he referred Plaintiff to gynecology/oncology. (R.p. 257). On November 18, 2011, Dr. Whitney Graybill (a gynecologist/oncologist) opined that definitive surgical intervention alone should address Plaintiff's cancer. (R.pp. 249-256). A hysterectomy was then performed on November 30, 2011 (five days after Plaintiff alleges she became disabled), and she was discharged from the hospital on December 2,



2011. (R.pp. 248, 297-305). Plaintiff experienced some pain and intermittent fever after surgery, but was much improved by December 30, 2011. (R.pp. 246-247).

On January 20, 2012, Plaintiff reported continued passage of very small clots and some lower pelvic pain, and Dr. Graybill thought that Plaintiff was suffering from a possible draining hematoma or a possible abscess. (R.pp. 243-245). However, by February 15, 2012, Plaintiff's symptoms were resolved except for some abdominal pain. Her Percocet was refilled. (R.pp. 241-242). By March 2012, Plaintiff was reported to be doing well and was referred back to her primary care physician for management of her migraine headaches. (R.pp. 239-240).

On March 16, 2012, Plaintiff reported to University Family Medicine that she had elevated blood pressure and three to four migraine headaches per week. Although she was scheduled to return to work the following week, Plaintiff stated that she did not feel ready as she had been through a lot lately (her mother's death and her own surgery for uterine cancer) and needed time to process everything that had happened. Dr. Tiffani Jepson assessed Plaintiff with migraines, likely triggered by current stressors, as well as with unstable depression without suicidal thoughts. Plaintiff's Paxil dosage was increased, and she was referred to a psychiatrist. Plaintiff refused, however, stating she could not afford to go as she already had outstanding medical bills. (R.pp. 237-238). Dr. Jepson then wrote a "to whom it may concern" letter stating that Plaintiff should remain out of work until further notice.[4] (R.p. 330).

On June 26, 2012, Plaintiff was treated at Trident Family Health for migraine headaches, which she said occurred four to five times a week. Topamax and Promethazine were

---

[4]Plaintiff's attorney at the time thought that Dr. Jepson's statement "might have been in connection with [Plaintiff's] long-term disability carrier," and Plaintiff testified that she did receive some (private) disability payments for a period of time after she stopped working. (R.p. 47).



prescribed. (R.pp. 312-313). In July 2012, Plaintiff reported that her migraines had decreased to three to four times a week, but that her depression persisted. She remained absent from work. Plaintiff also complained of poor short-term memory, which allegedly started when she lost her mother and she [Plaintiff] was diagnosed with cancer. Review of systems was significant for fatigue and lack of energy. It was noted that Plaintiff had been reluctant to see a psychiatrist since her depression began, but she was now willing to do so. Her medications were continued (R.pp. 309-311).

On August 6, 2012, Plaintiff reported to Trident Family Health that her headaches were overall improved and that she experienced a total of five headaches in the three weeks since her previous visit. However, she reported fatigue, a depressed mood, and an occasional hand tremor. Plaintiff's Topamax was increased and she was again referred to a psychiatrist, although she stated that she could not afford the $65 cost of a visit. (R.pp. 307-308).

Dr. Cashton Spivey, a psychologist, performed a consultative examination on October 10, 2012. Plaintiff told Dr. Spivey that she had been depressed since the death of her mother; reported a history of cancer and hysterectomy; and complained of memory deficits, dizziness, and migraines. Plaintiff also complained of symptoms suggestive of depression including sleep disturbance, reduction in appetite, low energy, attention/concentration problems, generalized anxiety, ruminations, panic attacks, and symptoms consistent with agoraphobia. Plaintiff stated that her daughter helped her manage her finances and helped her with shopping, although Dr. Spivey noted that Plaintiff performed household duties and chores independently and watched television. Further, Plaintiff's score of 27 out of 30 on a mini-mental status examination was within normal limits. Plaintiff presented with a sad mood and was anxious and tearful at times, but on examination Dr.



Spivey found that her affect was labile, her attention and concentration were fair, while her speech appeared to be "mildly" rapid due to anxiety. Dr. Spivey diagnosed Plaintiff with major depressive disorder, and panic disorder with agoraphobia. He assigned Plaintiff a current GAF of 50, but indicated her GAF had been 60 over the past 12 months.[5] He opined that Plaintiff might be capable of understanding simple instructions and performing simple tasks in the workplace. Dr. Spivey wrote that this assessment was based primarily on an estimate of Plaintiff's general intelligence score falling in the low average to average range. (R.pp. 315-318).

Dr. Daniel Bates of West Ashley Medicine and Urgent Care examined Plaintiff on November 20, 2012, at which time Plaintiff complained of headaches. Plaintiff's gait, strength, reflexes, and range of motion were all normal, although she exhibited some mild lumbar tenderness. Plaintiff's lower extremities were normal on inspection, there was no edema, and there was no crepitus. Dr. Bates diagnosed Plaintiff with an unspecified thyroid disorder, migraine headaches, neurotic depression, back pain, knee pain, and vertigo. (R.pp. 319-321).

In March 2013, a state agency physician and a state agency psychologist opined that Plaintiff did not have any severe physical or mental impairments. (R.pp. 82-85).

Plaintiff sought treatment at the Dream Center Clinic beginning in May 2013. (R.pp. 331-333). A note from the Dream Center Clinic dated June 6, 2013 indicated that Plaintiff was "still

---

[5]"Clinicians use a GAF [Global Assessment of Functioning] to rate the psychological, social, and occupational functioning of a patient." Morgan v. Commissioner of Soc. Sec. Admin., 169 F.3d 595, 597 n.1 (9th Cir. 1999). A GAF score between 41 and 50 indicates "serious symptoms" or "serious difficulty in social or occupational functioning," 51 to 60 indicates "moderate symptoms" or "moderate difficulty in social or occupational functioning," and 61 to 70 reflects only "mild symptoms" or "some difficulty in social, occupational, or school functioning." Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32-34 (4th ed. 2000). Plaintiff's GAF of 60 over the past twelve months put her at the high moderate bordering on mild range of functioning.



tired." She was assessed with hyperthyroidism, and directed to "RTC [return to clinic] ENDO." (R.p. 333).

## I.

### (RFC Analysis)

Plaintiff argues that the ALJ's RFC is not supported by substantial evidence because he failed to provide a narrative discussion and to perform a function-by-function assessment as required by SSR 96-8p. However, contrary to Plaintiff's argument, this is not a case where the ALJ made a conclusory determination as to Plaintiff's RFC or failed to explain his findings. Rather, a review of the decision shows that the ALJ appropriately discussed Plaintiff's impairments and the effect these impairments had on her ability to work during the relevant time period. The ALJ discussed all of Plaintiff's severe and non-severe impairments, identified limitations specifically pertaining to Plaintiff's impairments, and explained why he determined that she had the RFC to perform a range of medium work. (R.pp. 19-23). These findings are supported by substantial evidence in the case record, as discussed herein, and Plaintiff has provided no cogent basis on which this Court should overturn these findings consistent with the substantial evidence standard of review. Laws, 368 F.2d 640 [Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion"]; Hepp, 511 F.3d at 806 [Noting that the substantial evidence standard requires even less that a preponderance of the evidence]; Hays, 907 F.2d at 1456 [If there is evidence to justify refusal to direct a verdict were the case before a jury, then there is 'substantial evidence']; Clarke v. Bowen, 843 F.2d 271, 272-273 (8th Cir. 1988)["The substantial evidence standard presupposes . . . a zone of choice within which the decision makers can go either way without interference by the Courts"]; see also Trenary v. Bowen, 898 F.2d 1361, 1364 (8th Cir.



1990) [Courts should properly focus not on a claimant's diagnosis, but on the claimant's actual functional limitations]; Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996) ["The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court"].

First, the ALJ's RFC determination as to the extent of Plaintiff's physical limitations is supported by the objective medical evidence, or lack thereof. None of Plaintiff's treating or examining physicians placed any permanent restrictions[6] on Plaintiff's ability to perform the physical requirements of medium work or opined that she was disabled. See Lee v. Sullivan, 945 F.2d 687, 693 (4th Cir. 1991)[noting that no physician having opined that claimant was totally and permanently disabled supported a finding of no disability]; see also Craig v. Chater, 76 F.3d 589-590 (4th Cir. 1996) [noting importance of treating physician opinions]; Richardson v. Perales, 402 U.S. 389, 408 (1971) [assessments of examining, non-treating physicians may constitute substantial evidence in support of a finding of non-disability]. The ALJ also specifically noted that examinations routinely revealed that Plaintiff "was in no acute distress with a normal gait, intact sensation, normal motor function, normal range of motion, normal deep tendon reflexes, and no extremity edema...[and] examination of the [Plaintiff's] heart and lungs was normal." (R.p. 21). This determination is supported by the findings of Dr. Bates, who observed that Plaintiff had a normal gait and could heel/toe walk without difficulty; normal range of motion in all extremities and in her cervical and lumbar spine; negative straight leg raise testing; 5/5 [full] grip strength bilaterally; normal reflexes and sensation; normal tone, bulk, and strength; and no edema, cyanosis, or lesions in her lower

---

[6]Although Dr. Jepson wrote a note in March 2012 stating that Plaintiff was to remain off work until further notice for medical reasons, there is no indication that this restriction was permanent. In any event, the ALJ discounted this opinion because a review of the treatment records from MUSC revealed no evidence of any significant clinical findings to support the opinion. (R. p. 22).



extremities. (R.p. 320). <u>Cf</u>. <u>Gaskin v. Commissioner of Social Security</u>, 280 Fed.Appx. 472, 477

(6th Cir. 2008)[Finding that evidence of no muscle atrophy and that claimant "possesses normal

strength" contradicted Plaintiff's claims of disabling physical impairment]; <u>Haynes v. Astrue</u>, No.

09-484, 2010 WL 3377715 at * 3 (M.D.Ala. Aug. 25, 2010)["Muscle atrophy is an objective medical

indication of pain and lack thereof in [Plaintiff] militates against the conclusion that [she] suffers

from pain which precludes [her] from substantial gainful activity."]. Although Plaintiff suffered

from migraine headaches (which her physician in March 2012 thought were caused by stress - R.p.

238), by August 2012 the frequency of her headaches had decreased (R.p. 307), and there is no

indication that she complained of headaches at her June 2013 visit to the Dream Center Clinic (R.p.

333).

Plaintiff appears to argue that she could not perform medium work based on her back

and knee impairments. However, there is simply nothing to show that these impairments

significantly limited her ability to work. Plaintiff did not complain to her treating providers at

Family University Health or Trident Family Health about any back or knee problems. (<u>See</u> R.pp.

237-238, 307-314).[7] On March 16, 2012, Dr. Jepson wrote that Plaintiff had normal sensation and

reflexes. (R.p. 238). On June 26, 2012, Plaintiff was found to have a normal gait, normal balance,

and normal motor with no deformities in her extremities. (R.p. 313). Dr. Bates only noted that

Plaintiff had some "mild" lumbar tenderness, while also specifically finding that Plaintiff's gait,

strength, reflexes, and range of motion were all normal and that she had no crepitus in her lower

extremities. (R.p. 320). Again, no reversible error is shown in this evidence. <u>Thomas v. Celebreeze</u>,

---

[7]On August 19, 2011 (approximately three months prior to her alleged onset date), a provider at University Family Medicine noted that Plaintiff had no joint pain or swelling (R.p. 268).



331 F.2d 541, 543 (4th Cir. 1964) [court scrutinizes the record as a whole to determine whether the conclusions reached are rational]; Poling v. Halter, No. 00-40, 2001 WL 34630642, at * 7 (N.D.W.Va. Mar. 29, 2001) ["It is the duty of the ALJ, rather than the reviewing court, to assess the evidence of record and draw inferences therefrom"], citing Kasey v. Sullivan, 3F.3d 75, 79 (4th Cir. 1993); Cruse v. Bowen, 867 F.2d 1183, 1186 (8[th]Cir. 1989)["The mere fact that working may cause pain or discomfort does not mandate a finding of disability]; Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) [The mere presence of impairments does not automatically entitle a claimant to disability benefits, there must be a showing of related functional loss]; see also Welch v. Heckler, 808 F.2d 264, 270 (3d Cir.1986)[findings of moderate pain or discomfort were appropriately accounted for in a reduced RFC finding]; Andreolli v. Comm'r of Soc. Sec., 2008 WL 5210682, at *4 (W.D.Pa. Dec. 11, 2008) ["it is well settled that a claimant need not be pain-free or experiencing no discomfort in order to be found not disabled" (citing Welch v. Heckler, 808 F. 2d at 270)].

The ALJ's determination as to Plaintiff's mental RFC is also supported by substantial evidence. The ALJ thoroughly reviewed the medical evidence relating to Plaintiff's mental complaints and determined that she had only a mild restriction in her activities of daily living, and no more than a moderate restriction with regard to social functioning and concentration, persistence or pace. (R.pp. 18, 21-22). As a result of Plaintiff's migraines (which would likely cause some concentration problems), depression, and anxiety, the ALJ limited Plaintiff to work in a low stress setting with no more than occasional decision-making or changes in the work setting. (R.pp. 21-22). Further, based on Plaintiff's testimony that she has problems interacting with other people, he also limited her to no interaction with the general public. (R.p. 22). However, the ALJ did not find that Plaintiff's mental limitations were disabling, and the undersigned can discern no reversible error in



this conclusion. <u>Foster v. Bowen</u>, 853 F.2d 483, 489 (6th Cir. 1988) [A mental impairment diagnosis is insufficient, standing alone, to establish entitlement to benefits.].

The ALJ's decision is supported by Dr. Spivey's examination, which noted that Plaintiff's mental status examination was within normal limits, that she might be capable of understanding simple instructions and performing simple tasks in the workplace, and which assigned her GAF scores indicating she had had only moderate (bordering on mild) limitations over an extended (12 months) period of time. (R.p. 317). A treating source at Trident Family Health noted in July 2012 that Plaintiff was "still able to perform [activities of daily living] and still maintain[ed] a large degree of executive functioning." (R.p. 309). Additionally, Dr. Bates noted in November 2012 that Plaintiff displayed appropriate judgment, good insight, a euthymic mood, and an appropriate affect. (R.p. 320). This evidence supports the ALJ's mental RFC determination. <u>Kellough v. Heckler</u>, 785 F.2d 1147, 1149 (4th Cir. 1986) ["If the Secretary's dispositive factual findings are supported by substantial evidence, they must be affirmed, even in cases where contrary findings of an ALJ might also be so supported."] (citation omitted)]. Further, Plaintiff was previously able to work with anxiety, as her medical records indicate she suffered from anxiety prior to her alleged onset date (<u>see</u>, <u>e.g.</u> R.p. 271, noting that Plaintiff ran out of Paxil three months previously and she was having more panic attacks and anxiety in general due to her mother's cancer diagnosis), and there is no indication of any documented significant worsening of her condition (other than for a short period of time) after her alleged onset date. See <u>Orrick v Sullivan</u>, 966 F.2d 368, 370 (8th Cir. 1992) [absent showing of significant worsening of condition, ability to work with impairment detracts from finding of disability].



Indeed, it is readily apparent that the ALJ gave Plaintiff every benefit of the doubt by only giving the opinions of the state agency physicians (both of whom opined that Plaintiff did not have a severe physical or mental impairment, respectively) only "some weight", and assigning limitations greater than those opined to by these physicians, which he then accommodated for by imposing the RFC restrictions noted in the decision. (R.pp. 82-85). See Marquez v. Astrue, No. 08-206, 2009 WL 3063106 at * 4 (C.D.Cal. Sept. 21, 2006)[No error where ALJ's RFC finding was even more restrictive than the exertional levels suggested by the State Agency examiner]; cf. Muir v. Astrue, No. 07-727, 2009 WL 799459, at * 6 (M.D.Fla. Mar. 24, 2009)[No error where ALJ gave Plaintiff even a more restrictive RFC than the medical records provided].[8]

After a review of the decision and the record in this case, the undersigned does not find that the ALJ conducted an improper RFC analysis or that the decision otherwise reflects a failure to consider the effect of Plaintiff's impairments on her ability to work. Carlson v. Shalala,

---

[8]Plaintiff argues, inter alia, that in reaching his decision the ALJ improperly discounted her credibility by failing to explain the pace and manner in which she accomplishes her activities based on statements that she could not concentrate and focus on counting money, sometimes did not want to eat, did not have the energy to cook like she previously did, and usually wanted to just sit at home by herself. However, a review of the record indicates that the ALJ's determination, in which he qualified his finding that Plaintiff retained the ability to perform various activities "to some extent" (R.p. 21), is supported by substantial evidence. Dr. Spivey wrote that Plaintiff was able to perform household duties and chores independently; (R.p. 317); and in September 2012, Plaintiff reported that she was able to feed and bathe her cat and clean its litter box; prepare food or meals at least once a day; do laundry; clean her home; go out a few days a week; drive a car; shop for groceries and household items (which took her a couple of hours) approximately twice a week; pay bills, handle a savings account, and use a checkbook and money order (although she had her daughter double check her bills and accounts); watch television and movies; and visit with her children and their families several times a week. (R.pp. 192-196). See Johnson v. Barnhart, 434 F.3d at 658 [Accepting ALJ's finding that claimant's activities were inconsistent with complaints of incapacitating pain where she engaged in a variety of activities]; see also Mickles v. Shalala, 29 F.3d 918, 925-926 (4th Cir. 1994) [In assessing the credibility of the severity of reported subjective complaints, consideration must be given to the entire record, including the objective and subjective evidence].



999 F.2d 180, 181 (7th Cir.1993)["... the ALJ need not evaluate in writing every piece of testimony and evidence submitted....What we require is that the ALJ sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning.'"]; Bowen v. Zuckert, 482 U.S. at 146 [Plaintiff has the burden to show that she has a disabling impairment]; Jolley v. Weinberger, 537 F.2d 1179, 1181 (4th Cir. 1976)[finding that the objective medical evidence, as opposed to the claimant's subjective complaints, supported an inference that he was not disabled]; see also Knox v. Astrue, 327 F. App'x 652, 657 (7th Cir. 2009) ["[T]he expression of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient"], citing Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005); Osgar v. Barnhart, No. 02–2552, 2004 WL 3751471 at *5 (D.S.C. Mar. 29, 2004). Plaintiff's argument that the ALJ should have gone into even greater detail with respect to these findings is without merit. Dryer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) [ALJ not required to specifically refer to every piece of evidence in the decision]; Rogers v. Barnhart, 204 F.Supp.2d 885, 889 (W.D.N.C.2002).[9]

## II.

### (Inability to Afford Treatment)

Plaintiff also argues that in reaching his decision the ALJ erred by drawing improper inferences from her inability to afford proper treatment for her conditions, specifically citing the

---

[9]Plaintiff also appears to allege that based on her change to the "advanced age" category in October 2012, she should have been found disabled under the Medical-Vocational Guidelines (also known as the Grids) pursuant to Grid Rule 202.06. This rule applies to individuals who are capable of performing light work, are of "advanced age," have graduated from high school, and have a non-transferable skilled or semi-skilled work history, finding that such individuals are disabled. See 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 202.06. However, the cited rule applies to a person who has the RFC for light (or less) work. Here, the ALJ found that Plaintiff had the RFC for medium work.



ALJ having noted that there was no x-ray or MRI evidence of any significant knee or back abnormalities, that she did not require any mental health counseling or hospitalizations, and that she was not agreeable with the recommendation of counseling. Plaintiff argues that the ALJ essentially ignored Plaintiff's financial hardships, including that she was unable to see her endocrinologist because of cost, was not agreeable to counseling due to other outstanding medical bills, said she could not afford the $65 payment needed up front for a psychiatrist, submitted information indicating she was getting medications through a charitable organization, and stated she was evicted from her home and was staying with family.

However, while a claimant's failure to obtain medical treatment that she cannot afford cannot justify an inference that her condition was not as serious as she alleges; see Lovejoy v. Heckler, 790 F.2d 1114, 1117 (4th Cir. 1986); an unexplained inconsistency between the claimant's characterization of the severity of her condition and the treatment sought to alleviate that condition is highly probative of the claimant's credibility. See 20 C.F.R. § 416.929(c)(4); Mickles, 29 F.3d at 929-930. In determining that Plaintiff's knee and back impairments were not severe and in making his credibility and RFC findings, the ALJ did note that Plaintiff had not presented any x-ray or MRI evidence documenting any significant abnormalities. (R.p. 17). However, the ALJ also found that these impairments were not severe because her objective examinations documented that she had a  normal gait, normal range of motion, normal strength, normal deep tendon reflexes, negative straight leg raise testing, and no extremity edema, as well as that the medical evidence failed to reveal that Plaintiff was ever in any acute distress, and that her examinations were essentially benign. (R.pp. 17, 21). As previously noted, there is substantial evidence in the case record to support these findings. Lee v. Sullivan, 945 F.2d 687, 692 (4th Cir. 1991)[ALJ not



required to include limitations or restrictions in his decision that he finds are not supported by the record];  <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001)[holding that the court is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of" the agency].

Additionally, while Plaintiff did mention not being able to afford to go to an endocrinologist, she nevertheless received treatment for her condition from her primary care physicians at Family University Health and Trident Family Health, and there is no indication that any of her treating or examining providers referred her to an endocrinologist during the relevant time period.  (<u>See</u> R.pp. 237-238, 262-264, 307-311, 319-321).  Further, Plaintiff also later received treatment for her thyroid condition (including laboratory testing) at the Dream Center Clinic, where it appears she was to follow up there with "Endocrine."[10]  (R.p. 333).

As for her mental condition, although the ALJ noted Plaintiff's lack of mental health counseling or psychiatric hospitalizations, he did not determine her mental RFC based simply on a lack of treatment.  Despite her alleged lack of funds, Plaintiff obtained treatment (prescription medications) for her mental impairments during the relevant time period, and the ALJ noted that Plaintiff was able to perform her activities of daily living despite her allegedly disabling symptoms.  Additionally, the ALJ cited to Dr. Spivey's findings, the observations of other treating sources, and the finding of the state agency psychologist (that Plaintiff did not even have a severe mental impairment) in making his RFC determination.  (R.pp. 20-23).  Further, although Plaintiff told her physician at University Family Medicine in November 2011 that she was going to try to obtain

---

[10]It appears that the Dream Center Clinic, a free medical clinic, offers some specialist services, including endocrinology.  <u>See</u> Dream Center Clinic website, http://www.dreamcenterclinic.org/#!bout_us/csgz (last visited February 23, 2015).



counseling services through her job (R.pp. 262-263), there is no indication that she ever pursued this option, while her physician at Trident Family Health noted in July 2012 that Plaintiff had been reluctant to see a psychiatrist since her depression began.  (R.p. 310).

In sum, the ALJ did not determine Plaintiff's RFC based solely on her lack of treatment, but simply noted it among several factors he discussed.  See, e.g., King v. Colvin, No. 6:12-3043-TMC, 2014 WL 906795, at *2 (D.S.C. Mar. 7, 2014)[acknowledging that a plaintiff's inability to afford care may be a sufficient reason for failing to seek treatment, but finding that the ALJ's interpretation of this factor was harmless error where it was one factor the ALJ considered, but not the only factor or even the deciding factor].  Because the ALJ considered all of the medical and non-medical evidence in making his determination, any perceived error due to his discussion of Plaintiff's lack of treatment is harmless in this case.  See Mickles, 29 F.3d at 921 [finding the ALJ's error harmless when the ALJ would have reached the same result notwithstanding an error in his analysis]; Ngarurih v. Ashcroft, 371 F.3d 182, 190 n. 8 (4th Cir. 2004) ["reversal is not required when the alleged error clearly had no bearing on the . . . substance of the decision reached."]; Smith, 99 F.3d at 638 ["The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court"].

### III.

### (Opinion Evidence)

Finally, Plaintiff argues that "[t]he ALJ purported to rely on opinion evidence when there was none," and claims that the ALJ improperly rejected the testimony of her daughter, who "testified mainly as to her mother's mental limitations, which was entirely consistent with [Plaintiff's] self-reported activities, and Dr. Spivey's examination."



"[T]he ALJ must consider the relevant medical evidence and other evidence of the claimant's condition in the record, including testimony from the claimant and family members." Morgan v. Barnhart, 142 F. App'x. 716, 720 (4th Cir. 2005)(citing 20 C.F.R. § 404.1529(c)(3))). Here, the ALJ properly considered Plaintiff's daughter's testimony and gave it minimal weight because the daughter was not an "acceptable medical source" pursuant to 20 C.F.R. §§ 404.1513(a) and 416.913(a), and because her testimony was inconsistent with Plaintiff's presentation upon routine examinations and her activities of daily living. Where a lay witness's testimony merely repeats the allegations of a plaintiff's own testimony and is likewise contradicted by the same objective evidence discrediting the plaintiff's testimony, specific reasons are not necessary for dismissing the lay witness's testimony. See Lorenzen v. Chater, 71 F.3d 316, 319 (8th Cir.1995); Carlson v. Shalala, 999 F.2d 180 (7th Cir.1993); Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir.1992); Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir.1984).

Plaintiff also claims that the ALJ erred in giving "some weight" to the state agency physicians because they did not assess Plaintiff's RFC and because the ALJ had "already rejected" their opinions when he made his step two findings. However, contrary to Plaintiff's argument, the ALJ did not reject the opinions of the state agency physician and psychologist. Rather, he gave "some weight" to these opinions but concluded based on the overall evidence of record, and giving Plaintiff every benefit of the doubt, that Plaintiff's impairments were of a greater severity and resulted in the limitations set forth in the decision. (R.pp. 17, 21-23). Plaintiff fails to show that this was error. See Marquez, 2009 WL 3063106, at *4 [No error where ALJ's RFC finding was even more restrictive than the exertional levels suggested by the State Agency examiner]; see also Hays,



907 F.2d at 1456 [It is the responsibility of the ALJ to weigh the evidence and resolve conflicts in that evidence].

### **Conclusion**

Substantial evidence is defined as "... evidence which a reasoning mind would accept as sufficient to support a particular conclusion." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984). As previously noted, if the record contains substantial evidence to support the decision (i.e., if there is sufficient evidence to justify a refusal to direct a verdict were the case before a jury), this Court is required to uphold the decision, even should the Court disagree with the decision. Blalock, 483 F.2d at 775.

Under this standard, the record contains substantial evidence to support the conclusion of the Commissioner that the Plaintiff was not disabled within the meaning of the Social Security Act during the relevant time period. Therefore, it is recommended that the decision of the Commissioner be affirmed.

The parties are referred to the notice page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

February 26, 2015
Charleston, South Carolina

20



**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

